IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

ROBERT E. KENNEDY                                        PLAINTIFF

V.                              NO. 09-5175

MICHAEL J. ASTRUE,
Commissioner of Social Security Administration          DEFENDANT

## MEMORANDUM OPINION

Plaintiff, Robert E. Kennedy, brings this action pursuant to 42 U.S.C. §405(g), seeking judicial review of a decision of the Commissioner of the Social Security Administration (Commissioner) denying his claims for a period of disability and disability insurance benefits (DIB) under Title II of the Social Security Act (the Act) and Supplemental Security Income (SSI) under Title XVI of the Act.  In this judicial review, the Court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision.  See 42 U.S.C. §405(g).

## Procedural Background

Plaintiff filed his applications for DIB and SSI on April 17, 2007 (Tr. 87-89, 92-94), alleging disability since April 1, 2000. (Tr. 87).  Plaintiff's applications were denied initially and upon reconsideration.  (Tr. 32-33, 48-54).  Pursuant to Plaintiff's request, a hearing was held before an Administrative Law Judge (ALJ) on November 20, 2008, where Plaintiff and a Vocational Expert (VE)  testified.  (Tr. 7-31).  On February 11, 2009, the ALJ entered his decision, denying Plaintiff's request for a determination of disability.  (Tr. 36-47) .  The ALJ found that Plaintiff had the following severe impairments:  hypertension with left ventricular

-1-

hypertrophy (LVH)[1];   bradycardia;[2]   status-post permanent pacemaker placement; artherosclerotic heart disease; atrial septal defect (ASD); right thalamic lacunar infarct; type II diabetes mellitus (DM); and chronic kidney disease.  (Tr. 41).  However, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments, and after careful consideration of the entire record, found that Plaintiff had the residual functional capacity (RFC) to perform his past relevant work as an inventory clerk.  (Tr. 46).  Plaintiff's request for review was denied by the Appeals Council on June 24, 2009, and the decision of the ALJ therefore became the final decision of the Commissioner.  (Tr. 1-3).

**Evidence Presented**

Plaintiff was born in 1960 and completed four or more years of college.  (Tr. 122). Plaintiff was reported as being 5'5" tall and weighed 212 pounds.  (Tr. 115).  Plaintiff worked as a sales clerk at grocery stores from 1987 to 1993, and worked as an inventory auditor from 1996 to 1999.  (Tr. 117).  Plaintiff suffered from several conditions, beginning in 2000, and the records pertaining to his treatment for all of those conditions are relevant to the ultimate findings of the ALJ.  The Court therefore finds it necessary to set forth in detail the medical records relating to the various diagnoses, treatments, and results.

Beginning on April 5, 2000, Plaintiff presented himself to Washington Regional Medical Center (WRMC), complaining of left-sided numbness.  (Tr. 261).  The impression was: 1.

---

[1]Ventricular hypertrophy - hypertrophy of the myocardium of a ventricle of the heart, due to chronic pressure overload;... Dorland's Illustrated Medical Dictionary 910 (31st ed. 2007).

[2]Bradycardia - slowness of the heartbeat, as evidenced by slowing of the pulse rate to less than 60.  Id. at 249.

Malignant hypertension; 2. Right thalamic lacunar infarction; 3. Diffusely abnormal signal in the pons on a magnetic resonance imaging scan; 4. Left ventricular hypertrophy; and 5. Arteriolonephrosclerosis. (Tr. 263). He was reported as smoking 1 ½ packs of cigarettes per day and drinking 2-3 beers daily. A portable chest x-ray revealed an enlarged heart, but no acute pulmonary process was demonstrated. (Tr. 270). He was discharged, and instructed to discontinue smoking and alcohol. (Tr. 263). A renal artery doppler examination done on April 6, 2000, revealed a normal study. (Tr. 267).

On April 7, 2000, Plaintiff returned to the emergency room of WRMC, complaining of a whiteout episode he had experienced earlier, saying he had tunnel vision as well as left-sided weakness, numbness, inability to see out of his left eye, and slurred speech. (Tr. 244). In view of the abnormal findings during his hospitalization a couple of days earlier, it was felt that observation overnight with a neurological check was warranted. (Tr. 245). Dr. David Davis concluded that Plaintiff's brain stem abnormality was probably a toxic or metabolic problem, since it was so symmetrical and diffuse without significant mass effect. He also noted that Plaintiff had obstructive sleep apnea and was going to have overnight pulse oximetry that evening, with likely initiation of C-PAP at an empiric pressure. (Tr. 251).

On April 8, 2000, Dr. Stephen Johnson noted that Plaintiff smoked 1 ½ packs of cigarettes a day. (Tr. 247). His impression was: spells of marked dysarthria;[3] visual disturbance; one episode of left arm weakness with recent thalamic lacunar infarction; malignant hypertension; and uncharacterized brain stem abnormality on MRI. (Tr. 248). On

---

[3]Dysarthria - A speech disorder consisting of imperfect articulation due to loss of muscular control after damage to the central or peripheral nervous system. Id. at 583.

AO72A
(Rev. 8/82)

April 13, 2000, when Dr. Johnson next saw Plaintiff, he advised Plaintiff to taper off of his use of caffeine over a period of a couple of weeks, and also strongly urged Plaintiff to try to arrange for purchase of a C-PAP, as Dr. Davis had recommended, at a setting of 7.  He also told Plaintiff he needed to "absolutely cease tobacco use." (Tr. 276).

On May 11, 2000, when Plaintiff next saw Dr. Johnson, the doctor noted that Plaintiff had not been willing to consider treatment of his obstructive sleep apnea. (Tr. 275).  Dr. Johnson also strongly urged Plaintiff again to discontinue smoking completely.  (Tr. 275).

On May 16, 2000, Plaintiff was seen at The Eye Center and was found to have myopia[4] and hypertensive retinopathy.  (Tr. 344-345).

On April 17, 2001, Plaintiff again saw Dr. Johnson, who noted that Plaintiff had sleep apnea and was still not using a C-PAP, stating that he could not afford it.  (Tr. 274).  He was noted as having progressive fatigue and hypersomnolence,[5] associated with his weight gain.  (Tr. 274).  Dr. Johnson stated that his sleep apnea "is a major threat to him now as is his weight and continuing Excedrin use." (Tr. 274).

On December 24, 2001, Plaintiff presented himself to WRMC, complaining of dizziness. (Tr. 217).   The impression was:  41 year old male with second degree A-V block and bradycardia, currently on beta blocker therapy; history of severe hypertension; and known cerebrovascular disease, status post cerebrovascular accident. (Tr. 219).  Plaintiff noted that his

---

[4]Myopia - an error of refraction in which rays of light entering the eye parallel to the optic axis are brought to a focus in front of the retina, as a result of the eyeball being too long from front to back or of an increased strength in refractive power of the media of the eye.  Called also *nearsightedness,* because the near point is less distant than it is in emmetropia with an equal amplitude of accommodation.  Id. at 1243.

[5]Hypersomnolence - Hypersomnia
Hypersomnia - excessive sleeping or sleepiness, as in any of a group of sleep disorders with a variety of physical and psychologic causes.  Id. at 909.

heart rate was dropping down in the 30's, and that he progressively got weaker. (Tr. 220). It was felt that Plaintiff might eventually require a permanent pacemaker placement. (Tr. 221). An echo doppler was conducted, and on December 27, 2001, Dr. Jamon R. Pruitt recommended Plaintiff undergo a permanent pacemaker placement. (Tr. 231). A MRI of Plaintiff's brain revealed a resolution of the signal abnormality involving the pons, and there was no signal abnormality on the study to suggest presence of neoplasm. (Tr. 232).

On December 28, 2001, a dual chamber pacemaker was placed in Plaintiff by Dr. Pruitt. (Tr. 226). A chest exam was taken on December 29, 2001, and the impression was: "cardiac pacemaker in place with leads in right atrium and right ventricle; cardiomegaly; comparison with yesterday's film demonstrates that the patient has slightly more pulmonary vascular engorgement than on yesterday's film and there was also a slight increase in the interstitium in the lung bases." There was also small pleural effusion, and clinical correlation as to congestive failure was recommended. (Tr. 241). Plaintiff's discharge diagnoses on December 29, 2001 was:

1. Bradycardia secondary to a second-degree A-V block.
2. Hypertension with left ventricular hypertrophy.
3. Status post permanent pacemaker placement.
4. Normal coronary anatomy.
5. Remote cerebrovascular disease status post lacunar infarct.

(Tr. 215).

On January 4, 2002, Plaintiff was again seen by Dr. Pruitt, and Plaintiff told the doctor that he was feeling better than he had in a long time. (Tr. 327). Dr. Pruitt found that his wound was well healed and his hypertension was well controlled. (Tr. 327). The same finding was reported by Dr. Pruitt on January 28, 2002. (Tr. 405).

On August 14, 2002, Dr. Pruitt found that in view of Plaintiff's marked concentric left

-5-

ventricular hypertrophy by echo with dynamic outflow tract obstruction, he would like to switch Plaintiff off Hydralazine to an ACE inhibitor. (Tr. 325).

When Plaintiff visited Dr. Pruitt on September 25, 2002, Dr. Pruitt found that Plaintiff's hypertension was well controlled on Accupril, but with side effect of diarrhea; that Plaintiff had elevated blood sugar consistent with type II diabetes; that Plaintiff had a permanent pacemaker; and that Plaintiff had hypertension with dynamic LV outflow tract obstruction. (Tr. 324).

On April 28, 2003, Plaintiff presented himself to the Family Medical Center for evaluation of possible diabetes. (Tr. 196). Plaintiff advised Dr. Ornette Gaines that he had a pacemaker and stroke two years previously. He also reported that he smoked approximately 2 ½ packs of cigarettes per day, and that he did not plan to quit smoking at that time. (Tr. 196). He stated that he recovered from his stroke with no deficits neurologically and he was assessed as having elevated sugars. He again visited the Family Medical Center on May 28, 2003, and was reported as continuing to smoke and having chronic headaches for which he took Excedrin. (Tr. 195). He drank multiple Cokes and said he tried to work out, but was never consistent with it. He was assessed as having familial type hypertriglyceridemia[6] and elevated glucose. (Tr. 195).

On August 2, 2003, when Plaintiff saw Dr. Pruitt, the impression was:

1. Marked left ventricular hypertrophy concentric.
2. All other chambers sizes are normal.
3. Mild mitral regurgitation.
4. Moderate pulmonic insufficiency.
5. Mild tricuspid regurgitation.
6. Increased aortic valve velocities, possible left ventricular outflow tract obstruction.

---

[6]Familial hypertriglycerdemia - an autosomal dominant disorder of lipoprotein metabolism characterized by mildly elevated triglycerides and very-low-density lipoproteins. Id. at 910.

-6-

(Tr. 402-403).

On September 26, 2003, only a few weeks later, Dr. Pruitt gave the following impression:

1. Hypertension - controlled
2. Borderline diabetes mellitus
3. S/P permanent pacemaker placement - St. Jude with appropriate function.
4. Hypertension with dynamic left ventricular outflow tract obstruction
5. Hypertriglyceridemia.

(Tr. 322).

On November 20, 2003, Plaintiff presented again to Dr. Gaines at the Family Medical Center, stating that he had an eye exam and that it showed hypertensive retinopathy. (Tr. 194). He was reported as continuing to smoke 1-2 packs of cigarettes per day, and did not feel like quitting. (Tr. 194). He said his vision had been blurry and that he felt a little fatigued, but did not want to exercise at that time to lose weight. (Tr.194). He was assessed as having hypertriglyceridemia and diabetes mellitus (DM), new onset. (Tr. 194).

On November 26, 2003, Plaintiff saw Dr. Gaines, stating that he had an increase in thirst and urination. Otherwise, he stated all of his symptoms were resolved, and that he felt better and had no complaint of blurred vision, chest pain, shortness of breath, numbness or tingling of his extremities. Dr. Gaines shared with Plaintiff how serious it was for him to quit smoking due to his history of a stroke and heart attack. Dr. Gaines also recommended that Plaintiff change his lifestyle in terms of exercising. He was assessed as having hypertriglyceridemia; DM, uncontrolled, and renal insufficiency. (Tr. 193).

On February 2, 2004, when Plaintiff saw Dr. Gaines again, he said that he had been having problems with his vision. (Tr. 192). He thought that his vision problems were due to his medicines or his hypertriglyceridemia, and he therefore stopped taking his medicine two weeks

-7-

prior to his visit.   Dr. Gaines noted that Plaintiff had a history of stopping his medicine when he felt it was the cause of a side effect. (Tr. 192).  Dr. Gaines recommended that Plaintiff follow up with an optometrist for an eye exam.  (Tr. 192).

When Plaintiff next visited the Family Medical Center on March 8, 2004, he was reported as saying "if you can't eat like you want, can't smoke[,] what is there to live for?"  (Tr. 192). On April 12, 2004, Plaintiff reported to the Family Medical Center that he was not as tired and was feeling so much better that he did not think it was necessary to check blood sugars.  (Tr. 191).  He was reported as continuing to smoke, without any decrease, although he stated he was thinking about cutting down.  He also had not started exercising.  (Tr. 191).

On April 19, 2004, Dr. Pruitt reported that an interrogation of Plaintiff's pacemaker revealed a complete AV block.  (Tr. 321).  On April 23, 2004, when Plaintiff saw Dr. Gaines at the Family Medical Center, he said that he had not changed his diet at all and was no longer taking Tricor or Lopid for his triglycerides.  He also continued to smoke and did not exercise. (Tr. 190).  On May 24, 2004, when Plaintiff visited the Family Medical Center, he was reported as continuing to consume too many calories, CHO's (carbohydrates) and fat grams per day.  He was also still smoking 2-2 ½ packs of cigarettes per day and was not very committed to stopping. (Tr. 190).   The record reflects that Plaintiff was advised about blindness and kidney failure, dialysis and quality of life issues, and was reported as saying that he "might" try to cut down on fat grams and CHO intake, that he "might" try to cut back on smoking, and had not started Lopid as prescribed by Dr. Gaines, as he did not think he really needed it.  (Tr. 189-190).

On July 19, 2004, Plaintiff told the Family Medical Center that he had been very diligent in checking his CBG's (capillary blood glucose) and recording his diet, and that he had made

-8-

some positive changes in diet, with decreased soda intake, an increase in green vegetables, and reduced fat intake.  However, he was still smoking and was not exercising.  (Tr. 189).  On July 23, 2004, Dr. Gaines noted that Plaintiff stated he was going to wait six months before deciding whether he would take the Gemfibrozil for his hypertriglyceridemia, and continued to smoke and refused to exercise.  (Tr. 188).  He was assessed with hematuria and hypertriglyceridemia.  (Tr. 188).

On October 26, 2004, Plaintiff presented to the Family Medical Center for follow up of his diabetes, said he had been taking his Lopid, and continued to try to watch his diet.  (T. 186).  He continued to smoke and did not exercise.  (Tr. 186).  He was assessed as having diabetes, under control, hypertriglyceridemia, and proteinuria.[7]  (Tr. 186).

On November 4, 2004, Dr. Pruitt saw Plaintiff and noted that Plaintiff came in smelling strongly of cigarette smoke.  (Tr. 319).  He told Dr. Pruitt he was smoking about 3 packs of cigarettes per day at that point.  Dr. Pruitt counseled him in a "very strong manner" in view of his hypertension, hyperlipidemia, and diabetes, that if he continued to smoke "he would suffer irreversible cardiac damage and possible cerebral vascular disease."  (Tr. 319).  The impression was:

1. Appropriately functioning dual chamber pacemaker with complete AV block.
2. Hypertropic cardiac disease.
3. Hypertension.
4. Hyperlipidemia.
5. Diabetes.
6. Tobacco abuse.

(Tr. 319).  Dr. Pruitt noted that Plaintiff had been strongly counseled on discontinuation of

---

[7]Proteinuria - Excessive seru proteins in the urine, such as in renal disease, after strenuous exercise, and with dehydration.  Id. at 1558.

smoking, stating: "In a patient this age with these multiple risk factors it is somewhat silly for him to continue smoking." (Tr. 320).

On January 27, 2005, Plaintiff presented to the Family Medical Center, and was still smoking. He stated that he knew he needed to stop, and also refused to exercise and change his diet. (Tr. 185). On April 22, 2005, Plaintiff advised the Family Medical Center that he had some white floaters the previous week while cooking. (Tr. 184). He reported he was continuing to smoke and did not exercise. (Tr. 184).

On May 5, 2005, Plaintiff saw Dr. Pruitt again, and the impression was:

1. Hyperlipidemia;
2. Hypertropic caridiomyopathy.
3. Hypertension
4. NIDDM (non-insulin dependent diabetes mellitus)
5. Previous tobacco abuse now quit smoking.[8]

(Tr. 318).

On October 24, 2005, Plaintiff reported to the Family Medical Center that he felt okay, but that he had been eating increased fatty foods and not been following the diet as instructed. He was also not checking his CBG's. His weight had increased 7 pounds in 3 months, and he was urged to get back on his diet and to stop smoking. (Tr. 181). On February 23, 2006, the Family Medical Center again encouraged Plaintiff to exercise, control his diet, and to stop smoking. (Tr. 180).

On November 9, 2006, Dr. Pruitt found Plaintiff to have: LVH; appropriately functioning dual chamber pacemaker; hypertension; and diabetes. On January 4, 2007, Dr.

---

[8]The Court notes that on several occasions after May 5, 2005, Plaintiff was again urged to stop smoking. It therefore appears that Plaintiff did not, in fact, quit smoking at this time.

-10-

Pruitt reported Plaintiff as having hypertrophic obstructive cardiomyopathy; permanent dual chamber pacemaker; aortic, mitral and tricuspid insufficiency; diabetes mellitus; and dyslipidemia.[9] (Tr. 314).

On January 10, 2007, Plaintiff was admitted to the WRMC for a cardiac ultrasound. (Tr. 211). The impression was hypertrophic obstructive cariomyopathy with a dynamic left ventricular outflow tract obstruction; atrial septal defect (ASD)[10] noted; and pacing leads to RA (right atrium) and RV(right ventricle) were noted. On January 26, 2007, Dr. Pruitt found Plaintiff to have:

1. Atherosclerotic heart disease stable;
2. Left ventricular hypertrophy with dynamic left ventricular outflow tract obstruction.
3. Atrial septal defect.
4. Pacemaker secondary to AV block.
5. Diabetes.
6. Significant proteinuria.

(Tr. 312).

On February 15, 2007, Plaintiff was referred by Dr. Johnson to Dr. Michael Moulton at the Fayetteville Diagnostic Clinic for evaluation and management of renal insufficiency in the setting of diabetes. (Tr. 272). The impression was:

1. Chronic kidney disease with nephrotic range proteinuria.
2. LVH status post pacemaker placement.
3. Dyslipidemia, needs more aggressive lipid management.
4. Other problems are not currently as active at the present time.

---

[9]Dyslipidemia - abnormality in, or abnormal amounts of lipids and lipoproteins in the blood. Id. at 586.

[10]Atrial Septal Defect - An atrial septal defect is one of more openings in the interatrial septum, producing a left-to-right shunt, pulmonaryhypertension, and heart failure. Symptoms and signs include exercise intolerance, dyspnea, fatigue, and atrial arrhythmias. A soft midsystolic murmur at the upper left sternal border is common. Diagnosis is by echocardiography. Treatment is surgical or catheter-based repair. Endocarditis prophylaxis is not usually required. The Merck Manual 2407 (18th ed. 2006).

(Tr. 273).  On February 23, 2007, an ultrasound of Plaintiff's urinary tract revealed a normal renal size and echotexture without hydronephrosis.[11]  Tiny 5-6 mm renal cortical cysts were suspected in the upper pole portion of the right kidney and the lower pole portion of the left kidney.  (Tr.279).

On February 26, 2007, Plaintiff advised Dr. Pruitt that he had been doing well lately from a cardiac perspective.  Dr. Pruitt referred him to Dr. Mego for closure of his ASD.  Plaintiff stated that Dr. Mego's office called him, but he had not returned their calls because he did not want to have surgery yet because he was in a financial bind, due to all the medical bills that he had incurred.  (Tr. 310).  Dr. Pruitt's impression was:

1. Left ventricular hypertrophy.
2. ASHD stable
3. ASD - Atrial Septic Defect
4. S/P permanent pacemaker placement.
5. Diabetes mellitus.
6. S/P CVA
7. Hypertension uncontrolled
8. Tobacco base

(Tr. 310).  Dr. Pruitt counseled Plaintiff to quit smoking once again.  (Tr. 310).

On March 2, 2007, Plaintiff was seen at The Eye Center, where he was diagnosed with myopia and NIDDM without retinopathy.  (Tr. 332).

On May 31, 2007, Plaintiff saw Dr. Pruitt for a routine follow-up.  He had not followed up with Dr. Mego for his evaluation for ASD closure after CVA (cerebral vascular accident).  His blood pressure was well controlled, he had not had any complaints of chest pain or shortness of breath, syncope or near syncope, and there was no recurrent TIA (transient ischemic attack)

---

[11]Hydronephrosis - Distention of the pelvis and calices of the kidney with urine, as a result of obstruction of the ureter. Dorland's Illustrated Medical Dictionary  at 892.

or stroke like symptomatology.  (Tr. 347).

On June 26, 2007, a Physical RFC Assessment was completed by Stephen A. Whaley. (Tr. 354-361).  Dr. Whaley found that Plaintiff could occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds;  stand and/or walk about 6 hours in an 8-hour workday; sit about 6 hours in an 8-hour workday; and push and/or pull unlimited, other than as shown for lift and/or carry.  (Tr. 355).  He further found Plaintiff to have no postural, manipulative, visual, communicative, or environmental limitations.  (Tr. 356-358).  This assessment was affirmed by Dr. Jim Takach, on September 8, 2007.  (Tr. 365).

On March 18, 2008, Plaintiff was admitted to the WRMC with dehydration/ARF (acute renal failure).  (Tr. 368).  He was assessed as having dehydration, laryngitis, renal insufficiency, HTN (hypertension), DMII (diabetes mellitus II), and HLPD.[12]  (Tr. 371).  Plaintiff was reported as smoking 3 packs of cigarettes per day.  His pacer was in place and his heart was mildly enlarged.  (Tr. 396).  The impression was mild cardiomegaly.[13]  (Tr. 396).  A cardiac ultrasound was performed, and the impression from the ultrasound was:  hypertension well controlled on Accupril, but with side effect of diarrhea; elevated blood sugar consistent with type II diabetes; permanent pacemaker; and hypertension with dynamic LV outflow tract obstruction.  (Tr. 397-398).

Plaintiff was educated regarding newly prescribed medications, and was informed that he needed to schedule a sleep study at the Sleep Disorder Center.  (Tr. 378).  His discharge diagnoses was:

---

[12]The handwritten assessment refers to HLPD.  This acronym is consistent with the term hyperlipidemia, although the usual acronym is HLP.

[13]Cardiomegaly - Abnormal enlargement of the heart from either hypertrophy or dilatation.  Id. at 299.

AO72A
(Rev. 8/82)

1. Acute renal failure.
2. Metabolic acidosis.
3. Hypertension
4. Diabetes mellitus
5. Hyperlipidemia
6. Chronic kidney disease.

(Tr. 379).

On December 2, 2008, a CT scan of Plaintiff's abdomen and pelvis was performed at the

WRMC.  (Tr. 412).  The impression was:

1. Diffuse diverticulosis without evidence of diverticulitis.
2. Small lipoma measuring 1.0 cm in the third portion of the duodenum.  No obstructive appearance.
3. No evidence of renal stone, hydromephrosis, or hydroureter.
4.  A 1.3 cm low density lesion is seen in the right lobe interpolar region, not well characterized on noncontrast study.

(Tr. 413).

At the hearing held on November 20, 2008, Plaintiff stated that as a result of the left side

of his body going numb in April of 2000, his whole left side was different than his right side.

(Tr. 16).  He stated that he had a grip problem, and that he did not have any cognitive issues.  (Tr.

16-17).  He still had problems with fatigue - the stroke really tired him, and his other

impairments made it worse.  (Tr. 18).  He stated that he had to rest a lot when he walked, and

after five or six hours in the day, he was really pretty tired and had to take at least one nap every

day.  (Tr. 20-21).  He stated that he did not get a good night's sleep because he had some sleep

apnea issues.  (Tr. 21).  He stated that he suffered from a lot of digestive side effects and fatigue

from all the medication he took, and that he was in the bathroom probably five times a day.  (Tr.

22).  After he had acute kidney failure in 2007, he had to take insulin for three months and then

went back on the oral medication.  (Tr. 23).  Plaintiff stated that with respect to his daily

-14-

activities, he just sat in front of the television because he was too tired to do anything, and he never went out and visited with people since the stroke. (Tr. 25). He stated that he lived by himself in a house and took care of himself and the home. (Tr. 26).

**Applicable Law**

This Court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. Ramirez v. Barnhart, 292 F. 3d 576, 583 (8th Cir. 2002). Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. The ALJ's decision must be affirmed if the record contains substantial evidence to support it. Edwards v. Barnhart, 314 F. 3d 964, 966 (8th Cir. 2003). As long as there is substantial evidence in the record that supports the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently. Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001). In other words, if after reviewing the record, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. Young v. Apfel, 221 F. 3d 1065, 1068 (8th Cir. 2000).

It is well established that a claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and that prevents him from engaging in any substantial gainful activity. Pearsall v. Massanari, 274 F. 3d 1211, 1217 (8th Cir. 2001); see also 42 U.S.C. §§423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by

-15-

medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§423(d)(3), 1382(3)(D). A Plaintiff must show that his disability, not simply his impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require him to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant had engaged in substantial gainful activity since filing his claim; (2) whether the claimant had a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) met or equaled an impairment in the listings; (4) whether the impairment(s) prevented the claimant from doing past relevant work; and (5) whether the claimant was able to perform other work in the national economy given his age, education, and experience. See 20 C.F.R. §416.920. Only if the final stage is reached does the fact finder consider the Plaintiff's age, education, and work experience in light of his residual functional capacity (RFC). See McCoy v. Schwieker, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C.F.R. §416.920.

**Discussion**

**A. Plaintiff's Impairments**

The medical records clearly reflect that Plaintiff has suffered over the years with various illnesses relating to his heart; pacemaker placement; renal failure; hypertension; vision problems; and diabetes mellitus. The records also clearly reflect that Plaintiff has often been non-compliant with medication and failed to follow suggestions for treatment. For example, there were times when Plaintiff did not take his Tricor or Lopid or check his blood sugar, and stopped taking some of his medications when he felt they were causing certain side effects. He also admitted that he was not consistent in taking the Alphagan as prescribed by The Eye Center.

-16-

With respect to Plaintiff's hypertension, records reflect that it was controlled on many occasions by medication. In addition, Plaintiff was told to have a sleep order study done and to obtain a C-PAP. The discharge documentation record of Plaintiff's March 18, 2008, to March 21, 2008, hospitalization indicated that Dr. John Hey recommended a sleep study for Plaintiff as a possible cause for his hypertension, and that his hypertension was stable throughout the hospitalization. A consultative note prepared at that time indicated that Plaintiff said he had a sleep test done at ARFC, but he was not aware of the results. No further mention of such study was referenced in the records, and there is no record indicating that Plaintiff ever obtained a C-PAP.

Plaintiff was told to seek treatment for closure of his ASD (atrial septic defect) from Dr. Mego, which he never did. Plaintiff at times stated that he did not seek the suggested treatment because he was in a financial bind. However, Plaintiff was able to continue to afford up to 3 packs of cigarettes per day, and continued to smoke, despite health warnings from several doctors.

With respect to Plaintiff's diabetes, the record is replete with instances of Plaintiff failing on many occasions to watch his diet or exercise, to check his blood sugar levels, and to regularly take his medicine for his diabetes, despite instruction from doctors to do so. Regarding Plaintiff's vision, on March 2, 2007, The Eye Center diagnosed Plaintiff with LTG (low-tension glaucoma), well controlled, myopia, and NIDDM (non-insulin dependent diabetes mellitus) without retinopathy.

"Failure to follow a prescribed course of remedial treatment without good reason is grounds for denying an application for benefits." Brown v. Barnhart, 390 F.3d 535, 540-541 (8th

-17-

Cir. 2004), quoting from <u>Roth v. Shalala</u>, 45 F.3d 279, 282 (8th Cir. 1995).  Although lack of financial resources may sometimes justify the failure to seek medical attention or follow prescribed treatment, the Court is not convinced that such is the case here.  <u>Johnson v. Bowen</u>, 866 F.2d 274, 275 (8th Cir. 1989), quoting from <u>Benskin v. Bowen</u>, 830 F.2d 878, 884 (8th Cir. 1987) and <u>Brown v. Heckler</u>, 767 F.2d 451, 453 n.2 (8th Cir. 1985).   There is no evidence to suggest that Plaintiff sought any treatment offered to indigents or chose to forego smoking up to three packs of cigarettes per day to help finance the purchase of a C-PAP or surgery to close his atrial septal defect.  Nor is there any evidence in the record indicating Plaintiff was denied treatment due to lack of finances.  <u>See</u> <u>Riggins v. Apfel</u>, 177 F.3d 689, 693 (8th Cir. 1999).

The next question is whether Plaintiff has an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appdx 1.  The ALJ stated that he considered the listed impairments relating to the cardiovascular system in section 4.00, genitourinary impairments found in section 6.00, the endocrine system found in section 9.00, and neurological disorders found in section 11.00.

Plaintiff contends that although Plaintiff has been diagnosed with chronic obstructive sleep apnea, "which is undoubtedly related to his chronic fatigue," the ALJ neglected to address Plaintiff's sleep apnea or fatigue in any detail in rendering his adverse decision.  (Plaintiff's Appeal Brief, Doc. #5, p. 15).  First, the ALJ clearly stated that Plaintiff did not have an impairment "or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." He repeated this language throughout his decision.  In addition, the ALJ acknowledged Plaintiff's fatigue on more than one occasion (that Plaintiff tired after five or six hours each day, that he needed a one hour nap a day, that his

medications made him fatigued).  It is clear that the ALJ acknowledged and addressed Plaintiff's fatigue and considered it in combination with Plaintiff's other impairments.  Furthermore, it is logical to conclude that Plaintiff's sleep apnea could contribute to Plaintiff's fatigue, and Plaintiff's failure to follow medical advice to obtain a C-PAP is a factor to be considered in assessing Plaintiff's limitations.

The Court has also reviewed the relevant listings as they relate to the Plaintiff's diagnoses and symptoms, and finds that there is substantial evidence to support the ALJ's finding that Plaintiff does not have an impairment or combination of impairments that meets or medically equals on of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appdx I.

### B.  Plaintiff's Residual Functional Capacity

The ALJ found that Plaintiff had the RFC to lift and/or carry 20 pounds occasionally and 10 pounds frequently, stand and/or walk six hours in an eight-hour workday, and sit six hours in an eight-hour workday.  He also found that Plaintiff could only occasionally climb, crawl, balance, stoop, crouch and kneel.  In making this finding, the ALJ considered all the symptoms and the extent to which the symptoms could reasonably be accepted as consistent with the objective medical evidence, as well as the opinion evidence.  The ALJ also found that Plaintiff's statements concerning the intensity, persistence and limiting effects of the symptoms were not credible to the extent they were inconsistent with the RFC assessment.

Although the ALJ "bears the primary responsibility for assessing a claimant's residual functional capacity based on all relevant evidence," the Eighth Circuit Court of Appeals has also stated that a "claimant's residual functional capacity is a medical question." Baldwin v. Barnhart, 349 F.3d 549, 556 (8th Cir. 2003), quoting from Roberts v. Apfel, 222 F.3d 466, 469 (8th Cir.

AO72A
(Rev. 8/82)

2000); <u>Lauer v. Apfel</u>, 245 F.3d 700, 704 (8th Cir. 2001). Some medical evidence must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's ability to function physically in the workplace. <u>Nevland v. Apfel</u>, 204 F.3d 853, 858 (8th Cir. 2000). As stated by Defendant, the issue is not whether Plaintiff has a severe impairment and is experiencing pain, fatigue, or other symptoms; rather, it is whether the impairment and associate symptoms are so severe as to result in functional limitations that prevent all work activity. <u>See</u> <u>Blakeman v. Astrue</u>, 509 F.3d 878, 881 (8th Cir. 2007) ( "The issue is not whether Blakeman's heart condition is fatiguing, it is whether his fatigue is disabling."); <u>Clark v. Chater</u>, 75 F.3d 414, 417 (8th Cir. 1996); <u>Trenary v. Bowen</u>, 898 F.2d 1361, 1364 (8th Cir. 1990).

In his work activity report dated April 17, 2007, Plaintiff stated that he tried to work some at Jackson Hewitt in 2002, and that he stopped working there because of his health problems. He stated that he could not keep up with the work. However, at the hearing held before the ALJ, Plaintiff testified that he left Jackson Hewitt because he thought it was a "scam" operation.

Plaintiff stated that it was difficult for him to do much physical activity, and that he had to rest a lot when he walked. He stated that he sat in front of the television, never went out and visited with people, but could take care of himself and his home, where he lived by himself. He also stated that he took care of his sister's dog when she was out of town. He reported that he prepared his own meals, did his own laundry and cleaning, drove and shopped twice a week, could walk two blocks before needing to stop and rest, and could follow written and spoken instructions well. He also reported that he could use a weedeater on his small yard. The

-20-

Physical RFC Assessment prepared by Stephen Whaley confirmed the finding that Plaintiff was capable of performing light work.

Plaintiff alleges that the ALJ erred in finding Plaintiff's testimony was not fully credible. The ALJ considered Plaintiff's reported activities of daily living, the opinion of the state agency medical consultant, as well as the medical records. In Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir.1984) , the Eighth Circuit Court of Appeals stated that the ALJ may discredit subjective complaints if there are inconsistencies in the evidence as a whole. Id. The factors the ALJ is to consider when determining if Plaintiff's complaints are credible include:   the absence of an objective medical basis that supports the severity of the subjective complaints;  Plaintiff's daily activities;  the duration, frequency and intensity of Plaintiff's pain;  precipitating and aggravating factors;  the dosage, effectiveness and side effects of medication;  and functional restrictions. Id.  If the ALJ discredits testimony and explicitly gives good reasons for doing so, the Court is bound by the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole.  Robinson v. Sullivan,  956 F.2d 836, 841 ( 8th Cir. 1992);  see also Bradley v. Astrue, 528 F.3d 1113, 1115 (8th Cir. 2008);  Schultz v. Astrue, 479 F.3d 979, 983 (8th Cir. 2007).  In addition, the ALJ was allowed to consider Plaintiff's failure to stop smoking when making his credibility determination in this case, where Plaintiff had continued to smoke anywhere from two to three packs of cigarettes a day.  See Mouser v. Astrue, 545 F.3d 634, 638 (8th Cir. 2008).

**C.  Testimony of Vocational Expert**

The VE testified that the position of inventory auditor or inventory clerk was classified by the DOT as a medium, semiskilled job.  However, based on the records and the Plaintiff's testimony, the VE found that the job, as actually performed by the Plaintiff, would be classified

-21-

at a light level and was unskilled.  The ALJ asked the VE to assume a hypothetical person, 39 years old at the alleged onset date, 12 plus years of education, with the same work history as the Plaintiff.  He further asked him to assume that this person could occasionally lift and carry 20 pounds, frequently 10;  could stand and walk six hours;  sit six hours;  and occasionally climb, balance, crawl, stoop, crouch, and kneel.  The VE testified that this individual could return to the position of inventory clerk as he performed it, but not as described in the DOT.  The ALJ further asked the VE that if he reduced the lifting to less than 10 pounds and added the limitation that chronic fatigue would require the taking of frequent and unscheduled rest periods, what would be the result.  The VE stated that there would then be no jobs that such a person could do.  In addition, although the VE testified that an inventory clerk would generally fit within the medium semiskilled job level, the work as done by Plaintiff in this position fell in the light work category. According to the Commissioner's interpretation of past relevant work, a claimant will not be found disabled if he retains the RFC to perform:

> 1. The actual functional demands and job duties of a particular past relevant job; *or*
> 2. The functional demands and job duties of the occupation *as generally required by employers throughout the national economy.*

20 C.F.R. § 416.920(e); S.S.R. 82-61 (1982); Martin v. Sullivan, 901 F.2d 650, 653 (8th Cir. 1990)(expressly approving the two part test from S.S.R. 82-61).  Thus, the ALJ was justified in finding that Plaintiff would be able to perform his past relevant work as an inventory clerk. Plaintiff's capacity to perform this light level of work is supported by the fact that Plaintiff's treating and examining physicians placed no restrictions on his activities that would preclude Plaintiff from performing the RFC determined.  See Hutton v. Apfel, 175 F.3d 651, 655 (8th Cir. 1999) (lack of physician-imposed restrictions militates against a finding of total disability).

-22-

The Court finds that the hypothetical question posed to the VE accurately reflected Plaintiff's RFC as found by the ALJ.  Therefore, the ALJ was entitled to rely upon the opinion of the VE that Plaintiff would be able to perform his past relevant work as an inventory clerk.

**Conclusion**

Based on the foregoing, and having carefully reviewed the record, the undersigned finds substantial evidence supporting the ALJ's decision denying the Plaintiff benefits, and affirms the decision of the ALJ.

ENTERED this 12th day of July, 2010.


/s/ *Erin L. Setser*
HON. ERIN L. SETSER
UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)